## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Sharon Shawn Jamail, Individually<br>And On Behalf of All Others Similarly Situated,<br><br><br>Plaintiff,<br><br>v.<br><br>Morgan Stanley and Morgan Stanley & Co., Inc.,<br><br>Defendants. | CIVIL ACTION NO. _____<br><br>**CLASS ACTION COMPLAINT<br>FOR VIOLATIONS OF<br>FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

MAR 31 2008

U.S.D.C. S.D. N.Y.
CASHIERS

### INTRODUCTION

1.     This is a federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who purchased and continue to hold auction rate securities (also known as auction rate preferred stock, auction market preferred stock, variable rate preferred securities, money market preferred securities, periodic auction rate securities and auction rate bonds) offered for sale by defendants between March 31, 2003 and February 13, 2008, inclusive (the "Class Period").

2.     Defendants represented to investors that auction rate securities were equivalent to cash or money market funds; were highly liquid, safe investments for short-term investing; and were suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

3.     Defendants knew, but failed to disclose to investors, material facts about auction rate securities. In particular, defendants knew, but failed to disclose that these auction rate securities were not cash alternatives, but were instead, complex, long-term financial instruments with 30 year maturity dates, or longer. Defendants knew, but failed to disclose that auction rate securities were only liquid at the time of sale because defendants were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability.

Defendants knew, but failed to disclose that auction rate securities would become illiquid as soon as defendants stopped maintaining the auction market.

4.    On February 13, 2008, 87% of all auctions of auction rate securities failed when defendants and all other major broker-dealers refused to continue to support the auctions.  As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities collapsed, leaving the holders of more than $300 billion in auction rate securities with no means of liquidating investments defendants offered and sold as a suitable alternative to money market funds and other short term cash management vehicles.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5).

6.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), §1337.  Defendants maintain their principal places of business within this District and many of the acts giving rise to the violations complained of herein took place in this District.

7.    In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

8.    Plaintiff Sharon Shawn Jamail, as set forth in the accompanying certification, incorporated by reference herein, purchased auction rate securities underwritten and sold by Morgan Stanley during the Class Period and continued to hold such auction securities as of February 13, 2008.

2

9.    Defendant Morgan Stanley is incorporated in Delaware and its principal executive offices are located in New York, New York.  Morgan Stanley is one of the world's leading financial services firms.

10.    Defendant Morgan Stanley & Co., Inc. is incorporated in Delaware and its principal executive offices are located in New York, New York.  Morgan Stanley & Co., a wholly-owned subsidiary of Morgan Stanley, is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA").  Morgan Stanley & Co. is one of the largest underwriters and broker dealers of auction rate securities in the United States.

11.    Unless specifically noted, "Morgan Stanley" refers collectively to defendants Morgan Stanley and Morgan Stanley & Co., Inc.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

12.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased auction rate securities from Morgan Stanley between March 31, 2003 and February 13, 2008, inclusive, and continued to hold such auction securities as of February 13, 2008 (the "Class").  Excluded from the Class are defendants, the officers and directors of any defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant has or had a controlling interest.

13.    The members of the Class are so numerous that joinder of all members is impracticable.  The market for auction rate securities, while it existed, was estimated to exceed $300 billion in the United States and Morgan Stanley was the one of the largest underwriters and broker-dealers of auction rate securities while the market for such securities existed.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records

3

maintained by defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

14.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     Whether statements made by defendants to the investing public during the Class Period misrepresented or omitted material facts about the liquidity of and risks associated with auction rate securities and the market for such securities; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

15.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

16.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

17.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

18.     In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because: (a) the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for defendants; (b) the

4

prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## GENERAL ALLEGATIONS

### Background

19.    The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." Auction rate securities have generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date.

20.    Auction rate securities were first introduced in the 1980s. Since then, the market for auction rate securities grew dramatically and the current estimated value of auction rate securities in existence (prior to the collapse of the auction market) is around $350 billion.

21.    Investments in auction rate securities were initially limited to institutional investors, with required minimums of $250,000. In recent years, however, issuers and sellers of auction rate securities have lowered the minimum amount invested to $25,000, in an effort to market auction rate securities as widely as possible to the general public.

22.    Auction rate securities were auctioned at par value, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction. The method for auctioning the securities was described in the prospectus of the fund through which they were offered, though the formula was substantially similar for all securities offered as auction rate securities.

23.    The number of days between each auction was set by the prospectus. Generally, the auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period.

24.     The auction itself was of the type commonly referred to as a "Dutch" auction, i.e. one where the price was initially set at a presumably economically unattractive level and then made more attractive to purchasers throughout the course of the auction. For auction rate securities, bids with successively higher rates were offered until all of the securities at the auction were sold.

25.     At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate." The clearing rate was determined by finding the lowest rate bid which was sufficient to cover all of the securities for sale in the auction. If several bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the clearing rate bidders. The auction agent, at the end of the auction, allocated the shares per the formula. If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a level defined in the prospectus. This rate was generally lower than the market rate.

26.     During an auction, an investor could submit one of four different orders: (1) a Hold order to keep the shares out of the auction regardless of the new interest rate; (2) a Hold at Rate order, where if the clearance rate was below the bid to hold rate, then the securities were sold; (3) a Sell order, which was to sell the shares at the auction regardless of the clearing rate; and (4) a Bid order, to submit a bid to buy at a new position at a specified minimum interest rate. Since there was no preference in awarding shares to existing holders and new buyers, there was little practical difference between a Hold at Rate order and a Buy order.

27.     If there were not enough orders to purchase all the shares being sold at the auction, a failed auction occurred. In this situation, the rate was set to a "maximum rate" described by either a formula or a multiplier of a reference rate, such as the Bond Market Association index. Either way, the maximum rate was set out in the prospectus. If the auction failed then none of the current shareholders could sell their shares, no matter what type of order they issued. The maximum rate for many auction rate securities, particularly those invested in corporate debt

6

securities or preferred stocks, was relatively small, however. As a result, if the auction failed, owners unable to sell their shares would receive limited interest on their illiquid investments.

28.     The issuer of each auction rate security selected one or more broker-dealers to underwrite the offerings and to manage the auction process. Investors could only submit orders through the selected broker-dealers. The issuer paid an annualized fee to each broker-dealer engaged to manage an auction.

29.     Investors were required to submit an order to the broker-dealer by a deadline set by the broker-dealer. This deadline was generally set early enough by the broker-dealer so that it had time to process and analyze the orders before having to submit the orders to the auction agent. This gave the broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its own account.

30.     Broker-dealers would often engage in a number of practices to influence the auction process, including, for example, submitting their own orders to purchase or sell shares for their own accounts. In 2004, the SEC began to investigate these manipulative practices affecting the auction market. In 2006, the SEC entered into a consent decree with a number of major broker-dealers, including Morgan Stanley, which required them to disclose certain practices to investors and to stop engaging in certain other practices. The SEC consent decree noted that in many cases, the broker-dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they claimed. The consent decree did nothing to end the practice of the broker-dealers submitting bids for their own accounts after receiving notice of what orders their customers planned to place, so long as the broker-dealers disclosed this practice to their customers.

**During the Class Period, Morgan Stanley Materially Misrepresented the Liquidity of and Risks Associated With Auction Rate Securities and Omitted Material Facts About Its Role and the Auction Market**

31.    Auction rate securities were extremely profitable for Morgan Stanley and for the Morgan Stanley financial advisors who sold the securities. As a large underwriter of auction rate securities, Morgan Stanley received significant underwriting fees from the issuers of these securities. As one of the largest broker-dealers, Morgan Stanley also entered into broker-dealer agreements with the issuers and was paid an annualized broker-dealer fee for operating the auction process for more than auction rate securities. Morgan Stanley also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell auction rate securities for its own account. Individual Morgan Stanley financial advisors had a significant financial incentive to sell auction rate securities, as they were compensated by Morgan Stanley for each auction rate security sold.

32.    In order to perpetuate the auction market and sell as many auction rate securities as possible, Morgan Stanley represented to investors in its written materials and uniform sales presentations by financial advisors that auction rate securities were the same as cash and were highly liquid, safe investments for short-term investing. Pursuant to uniform sales materials and top-down management directives, Morgan Stanley financial advisors throughout the United States represented to current and potential Morgan Stanley clients that the auction rate securities sold by Morgan Stanley were equivalent to cash or money market funds and were safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest. Alternatively, Morgan Stanley placed investors in auction rate securities, in lieu of money market funds or other cash investments, without informing them that it would do so and without their knowledge or consent.

33.    Morgan Stanley failed to disclose to investors material facts about auction rate securities. Morgan Stanley failed to disclose that these securities were not cash alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30 year maturity dates, or longer. Morgan Stanley failed to disclose that the auction rate securities it was selling were only liquid at the time of sale because Morgan Stanley and other broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the

8

appearance of liquidity and stability. In fact, at all relevant times during the Class Period, the ability of holders of auction rate securities to liquidate their positions depended on the maintenance of an artificial auction market maintained by Morgan Stanley and the other broker-dealers. When Morgan Stanley and the other broker-dealers stopped artificially supporting and manipulating the auction market, the market immediately collapsed and the auction rate securities sold by Morgan Stanley became illiquid. Morgan Stanley also failed to disclose that the auction rate securities it was selling were not short-term investments, but rather long term bonds or preferred stocks with maturities sometimes exceeding 30 years. Finally, Morgan Stanley failed to disclose that the short-term nature of the securities and the ability of investors to quickly convert their auction rate securities into cash depended entirely on the perpetuation of the artificial auction market being maintained by Morgan Stanley and the other broker-dealers.

34.    Morgan Stanley also failed to disclose to purchasers of auction rate securities material facts about its role in the auctions and the auction market in which these securities were traded. Morgan Stanley failed to disclose that in connection with the sale of auction rate securities, Morgan Stanley simultaneously was acting on behalf of the issuer, who had an interest in paying the lowest possible interest rate, on behalf of the investor, who was seeking the highest possible return, and on its own behalf, to maximize the return to Morgan Stanley on its holdings of the auction rate securities. Morgan Stanley failed to disclose that it and other broker-dealers routinely intervened in auctions for their own benefit, to set rates and prevent all-hold auctions and failed auctions. Morgan Stanley failed to disclose that without this manipulation of the auction market, many auctions likely would have failed, as a result of which investors would have had the ability to determine the true risk and liquidity features of auction rate securities. Morgan Stanley continued to aggressively market auction rate securities after it had determined that it and other broker dealers were likely to withdraw their support for the periodic auctions and that a "freeze" of the market for auction rate securities would result.

35.    During the Class Period, Morgan Stanley failed to disclose that the auctions it was conducting were not governed by arms-length transactions but instead suffered from systemic

flaws and manipulative practices, including allowing customers to place open or market orders in auctions, intervening in auctions by bidding for Morgan Stanley's proprietary account or asking customers to make or change orders, preventing failed auctions and all-hold auctions to set the market rate, submitting or changing orders after auction deadlines, not requiring customers to purchase partially-filled irrevocable orders, providing certain customers with higher returns than the auction clearing rate, and providing inside information about the auction process to certain customers in connection with the auction bidding.

### The Market for Auction Rate Securities Collapses

36.     In the summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, but these securities represented only 2-6% of the entire auction rate securities market.  In the fall-winter of 2007, more auctions began to fail.  Even though some of the auctions that failed initially were conducted by Morgan Stanley, it continued to encourage investors to purchase auction rate securities and continued to represent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the risks associated with the securities.

37.     On February 13, 2008, 87% of all auctions of auction rate securities failed when all of the major broker-dealers, including Morgan Stanley, refused to continue to support the auctions.

38.     On February 14, 2008, it was disclosed that UBS had decided to no longer support the auction market.  Virtually every other major broker-dealer, including Goldman Sachs, Morgan Stanley, Lehman Brothers and Merrill Lynch, among others, also decided around the same time to withdraw their support of the auction market.  As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities has collapsed, rendering more than $300 billion of outstanding securities illiquid.

39.     The market for auction rate securities sold by Morgan Stanley was open, well-developed and efficient at all relevant times until the truth emerged and the auction market collapsed.  As a result of the materially false and misleading statements and failures to disclose, auction rate securities sold by Morgan Stanley traded at artificially inflated prices during the

Class Period. Plaintiff and other members of the Class purchased and continued to hold auction rate securities sold by Morgan Stanley relying upon the integrity of the auction market and the market price of those securities, and have been damaged thereby.

40.    During the Class Period, defendants materially misled the investing public, thereby allowing the auction market to continue and inflating the price of auction rate securities sold by Morgan Stanley by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the auction market and the auction rate securities sold by Morgan Stanley, as alleged herein.

41.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about the auction market and the auction rate securities sold by Morgan Stanley. These material misstatements and omissions had the cause and effect of perpetuating the auction market and creating in that market an unrealistically positive assessment of the auction rate securities sold by Morgan Stanley, thus causing those securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing and continuing to hold auction rate securities sold by Morgan Stanley at artificially inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

42.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary

11

statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Morgan Stanley who knew that those statements were false when made.

**LOSS CAUSATION/ECONOMIC LOSS**

43.    During the Class Period, as detailed herein, defendants engaged in a scheme and course of conduct to create a market for and artificially inflate the price of auction rate securities sold by Morgan Stanley that operated as a fraud or deceit on purchasers of auction rate securities sold by Morgan Stanley by misrepresenting the liquidity of and risks associated with such securities. Defendants achieved this by making false and misleading statements about the auction market and the auction rate securities sold by Morgan Stanley. When Morgan Stanley's prior misrepresentations and omissions were disclosed and became apparent to the investing public, the market for auction rate securities collapsed and the auction rate securities sold by Morgan Stanley have become illiquid. As a result of their purchases of auction rate securities from Morgan Stanley during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws in that the securities have substantially less value than that represented by defendants.

44.    The collapse of the auction rate securities market at the end of the Class Period was a direct result of defendants' unilateral decision to no longer artificially support the auction rate securities market and the nature and extent of defendants' fraud finally being revealed to investors.

**BASIS OF ALLEGATIONS**

45.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings, regulatory filings and reports, securities analysts'

12

reports, interviews with purchasers of auction rate securities, press releases and media reports, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act
### Against All Defendants

46.     Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiff brings this cause of action on behalf of herself and the Class.

47.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) enable defendants to sell hundreds of millions, if not billions, of dollars of auction rate securities to current and prospective Morgan Stanley clients, and on which Morgan Stanley made substantial commissions; and (iii) cause plaintiff and other members of the Class to purchase auction rate securities from Morgan Stanley at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

48.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from Morgan Stanley in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the auction rate securities sold by Morgan Stanley, as specified herein.

50.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the auction rate securities sold by Morgan Stanley were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the auction rate securities in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from Morgan Stanley during the Class Period.

51.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts.     Such defendants' material misrepresentations and/or omissions were done knowingly or deliberately and for the purpose and effect of concealing the truth about the liquidity of and risks associated with auction rate securities from the investing public and supporting the artificially inflated price and market for these securities.  If defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market and market price of the auction rate securities sold by Morgan Stanley was artificially inflated during the Class Period.

In ignorance of the fact that the market prices of auction rate securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the auction market in which the auction rate securities were traded, and/or on the absence of material adverse information that was known to or deliberately disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired and continued to hold auction rate securities sold by Morgan Stanley during the Class Period at artificially high prices and were damaged thereby.

53.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the liquidity of and risks associated with the auction rate securities sold by Morgan Stanley, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased and continued to hold their auction rate securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

54.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

55.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases of auction rate securities sold by Morgan Stanley during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Defendant Morgan Stanley

56.     Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on behalf of herself and the Class.

57.     Defendant Morgan Stanley acted as a control person of defendant Morgan Stanley & Co., Inc. within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue

of its 100% ownership of Morgan Stanley & Co., Inc., Morgan Stanley had the power to influence and control and did influence and control, directly or indirectly, the decision-making by Morgan Stanley & Co., Inc., including the content and dissemination of the various statements which plaintiff contends are false and misleading. Morgan Stanley was provided with or had unlimited access to copies of the reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.    As set forth above, Morgan Stanley & Co., Inc. violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of its position as a controlling person, Morgan Stanley is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchase and retention of auction rate securities from Morgan Stanley during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

E.    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 31, 2008

Respectfully submitted,

**SEEGER WEISS LLP**

By:

Christopher A. Seeger (CS-4880)
Stephen A. Weiss (SW-3520)
David R. Buchanan (DB-6368)
One William Street, 10th Floor
New York, NY 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

Daniel C. Girard
Jonathan K. Levine (JL-8390)
Aaron M. Sheanin
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO, 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101

Counsel for Plaintiff Sharon Shawn Jamail

# ATTACHMENT A

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Sharon Shawn Jamail, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed the complaint against Morgan Stanley, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.

2.    I did not acquire any auction rate securities from Morgan Stanley at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.    I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.    I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7.    My purchases and sales of auction rate securities sold to me through Morgan Stanley are attached as **Attachment A** to this document:

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this _18_th day of March, 2008

Sharon Shawn Jamail

**ATTACHMENT A**

**SHARON SHAWN JAMAIL'S TRANSACTIONS IN AUCTION RATE
SECURITIES SOLD BY MORGAN STANLEY BETWEEN
MARCH 25, 2003 AND FEBRUARY 13, 2008,
AND HELD AS OF FEBRUARY 13, 2008**

| Trade Date | Auction Rate Security | Number of Shares | Price Per Share/Unit | Buy or Sell |
|---|---|---|---|---|
| December 24, 2007 | Citizens Property Insurance Corp. Florida ARS-PERS. & Coml. Line-SR-4 Variable | 1 | $25,000 | Bought |
| December 26, 2007 | Massachusetts EDL Fing. Auth. Edln. Rev. Issue-E Series C Variable | 2 | $25,000 | Bought |
| March 13, 2008 | Citizens Property Insurance Corp. Florida ARS-PERS. & Coml. Line-SR-4 Variable | 1 | $25,000 | Redeemed |